J-S35001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.S.F.-K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 839 MDA 2024 |

Appeal from the Decree Entered May 14, 2024
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2024-0026a

BEFORE:  PANELLA, P.J.E., MURRAY, J., and KING, J.

MEMORANDUM BY PANELLA, P.J.E.:          **FILED: NOVEMBER 14, 2024**

S.L.B. ("Mother") appeals from the May 14, 2024 decree entered in the Court of Common Pleas of York County involuntarily terminating her parental rights to her biological daughter, L.S.F.-K., born in September 2008.[1] After careful review, we affirm.

We summarize the following relevant facts and procedural history based largely upon L.S.F.-K.'s dependency record, which was incorporated into the record of the subject termination proceeding. **See** N.T., 5/14/2024, at 26-27. The York County Office of Children, Youth, and Families ("CYF" or "the Agency") became involved with this family due to allegations of truancy regarding L.S.F.-K. and her brother, G.F.-K., during the 2021-2022 school

---

[1] J.M.K. ("Father") was present at the May 14, 2024 termination hearing and voluntarily relinquished his parental rights to L.S.F.-K. The orphans' court entered a decree confirming consent on the same date, which Father did not appeal.

year. L.S.F.-K. was thirteen years old and in seventh grade at that time. L.S.F.-K.'s school and the Agency attempted to assist Mother with alleviating the truancy, but they were unsuccessful. As such, CYF filed a dependency petition, which the juvenile court granted following a hearing on May 4, 2022. With court supervision, L.S.F.-K. remained in the legal and physical custody of Mother.

However, approximately one month later, L.S.F.-K. requested that CYF remove her from Mother's home. L.S.F.-K. was taken to Crisis Intervention, which as best we can discern was a behavioral health hospital, due to her suicidal ideations. L.S.F.-K. routinely expressed that she did not feel safe in Mother's home due to threats from her older brothers M.F. and G.F.-K., who, while not parties to these proceedings, are nonetheless relevant to the circumstances presented in Mother's home.

Significantly, L.S.F.-K. had untreated mental health concerns prior to requesting removal from Mother's home. L.S.F.-K. completed a neuropsychological evaluation in March 2022, and was diagnosed with, *inter alia*, autism, other specified trauma and stressor related disorder, attention deficit hyperactivity disorder ("ADHD"), unspecified depressive disorder, generalized anxiety disorder, and history of abuse during childhood.[2] L.S.F.-K. was hospitalized in a behavioral health hospital from December 2022 until

---

[2] Prior to adjudication, the juvenile court held two pre-hearing conferences at which Mother, L.S.F.-K., and G.F.-K. were ordered to participate in neuropsychological evaluations.

May 2023 following suicidal ideations that were accompanied by specific planning. Upon her discharge, the behavioral health hospital recommended placement in foster care or a group home with ongoing treatment. L.S.F.-K. was ultimately placed at a RISE Program group home through CYF in August 2023, where she remained at the time of the subject termination proceedings.

The certified record indicates that while living in Mother's home, L.S.F.-K.'s oldest brother M.F., who was an adult at the time, had menaced her with a knife and repeatedly threatened to kill her. M.F. had untreated mental health issues, which were serious enough that the Agency was unable to enter Mother's home due to safety concerns.

L.S.F.-K.'s other brother, G.F.-K., then fifteen years old, had been physical with her in Mother's home and repeatedly encouraged her to commit suicide. The following relevant facts and procedural history as to G.F.-K. are based largely upon his dependency record, which was also incorporated into the record of the termination proceedings. *See* N.T., 5/14/2024, at 35. G.F.-K. was also adjudicated dependent on the same date as L.S.F.-K. and remained in Mother's care.[3] He additionally participated in a neuropsychological evaluation, which resulted in the following diagnoses, *inter alia*: autism, post-traumatic stress disorder ("PTSD"), ADHD, persistent depressive disorder, generalized anxiety disorder, and history of physical and

---

[3] The Agency was previously involved with G.F.-K. in September 2016 due to allegations that he was being sexually abused by Father. The outcome of this involvement is unclear from the instant certified record.

sexual abuse during childhood. G.F.-K.'s untreated mental health concerns ultimately resulted in a suicide attempt in November 2022. He was removed from Mother's care at that time and was involuntarily hospitalized at a behavioral health facility for several months.

During the ensuing dependency proceedings, the juvenile court found that Mother had minimal compliance and progress with her permanency plan in G.F.-K.'s dependency proceedings as of March 2023, but he had to leave the behavioral health hospital no later than March 24, 2023. The Agency contacted numerous placement options for G.F.-K. without success. Ultimately, G.F.-K. was returned to Mother's physical and legal custody on April 6, 2023, and his dependency matter was later discharged on June 19, 2023, when he was just shy of turning seventeen years old.

Mother also had untreated mental health concerns at the time of L.S.F.-K.'s removal from her home. *See* Neuropsychological Evaluation of Mother, 3/22/2022. Specifically, Mother's neuropsychological evaluation revealed the following diagnoses, *inter alia*: bipolar disorder, PTSD, generalized anxiety disorder, ADHD, and somatic symptom disorder. *See id.* at 7. This evaluation recommended that Mother receive comprehensive psychiatric care and psychotherapy, participate in a partial hospitalization program, complete a neurological "work up," participate in mental health case management, participate in a re-evaluation in one-two years; and participate in weekly outpatient individual psychotherapy. *See id.* at 9.

The juvenile court established L.S.F.-K.'s respective permanency goal as reunification. To facilitate reunification, Mother was ordered to: comply with all recommendations and make progress related to her mental health, engage in the mental health treatment of L.S.F.-K., and maintain financial and housing stability. *See* N.T., 5/14/2024, at 19. Mother was also required to participate in supervised visitation with L.S.F.-K. As best we can discern, Mother was offered weekly therapeutic supervised visitation with L.S.F.-K., although Mother's level of participation is unclear from the record. Mother never progressed past supervised visitation. In August 2023, the juvenile court ceased all contact between L.S.F.-K. and Mother, which will be discussed further *supra*. The juvenile court found that Mother's compliance and progress with her goals were minimal and at best moderate over the course of L.S.F.-K.'s dependency proceedings.

On February 23, 2024, CYF filed a petition for the involuntary termination of Mother's parental rights to L.S.F.-K. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The court held an evidentiary hearing on the petition on May 14, 2024, at which time L.S.F.-K. had been removed from Mother's care for twenty-three months. L.S.F.-K.'s best interests were represented by guardian *ad litem* ("GAL") Daniel Worley, Esquire, and her legal interests were represented by T.L. Kearney, Esquire.[4]

---

[4] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to

*(Footnote Continued Next Page)*

CYF presented the testimony of caseworker Yomaira Sharp in support of its petition to terminate Mother's parental rights. Mother testified on her own behalf. Through her GAL and legal counsel, L.S.F.-K. requested to testify *in camera* in the presence of all counsel. She was then fifteen years old and in eighth grade.[5] Upon inquiry by the orphans' court, she testified as follows:

> Q: Well, anything you want to tell me about what your desires are for today relative to your mom? Your dad was more than happy to sign off, I'm sorry to say.
>
> A: It's okay. I want to be an orphan.

N.T., 5/14/2024, at 41-42.

By decree dated and entered the same day as the hearing, the orphans' court terminated Mother's parental rights to L.S.F.-K. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[6] Mother filed a timely notice of appeal

---

represent the legal interests of children in contested termination proceedings, in conformity with" 23 Pa.C.S.A. § 2313(a). ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020). As L.S.F.-K.'s legal interests were represented by counsel separate from her best interests, the requirements of 23 Pa.C.S.A. § 2313(a) are met.

[5] L.S.F.-K. is one year behind in school, as she will be entering ninth grade instead of tenth grade for the 2024-2025 school year. ***See*** N.T., 4/18/2024, at 17-18. She plans on participating in a credit recovery program once in high school to achieve her age-appropriate grade level. ***See id.***

[6] The orphans' court's original May 14th decree included an error in the year, listing 2021 instead of 2024. Therefore, on July 12, 2024, this Court entered an order directing the orphans' court to enter an amended decree correcting the date used within the body of the order. ***See*** Pa. R.A.P. 1701(b)(1) (the orphans' court may take action to correct formal errors in papers relating to the matter). The orphans' court complied on July 30, 2024.

and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on July 3, 2024.

On appeal, Mother raises the following issues for our review:

1. Whether the [orphans'] court erred in terminating the parental rights of Mother pursuant to Sections 2511(a)(1), (2), (5), and (8) of the Adoption Act?

2. Whether the [orphans'] court erred in concluding that termination of parental rights would best serve the needs and welfare of L.S.F.-K. pursuant to Section 2511(b) of the Adoption Act?

3. Whether the [orphans'] court erred or committed an abuse of discretion where at the time L.S.F.-K. was adjudicated dependent, there was also a sibling that was adjudicated dependent at that same time; however, that child (G.F.-K.) was returned to Mother and court jurisdiction terminated and was still with Mother (and no dependency action) at the time that Mother's rights were terminated as to L.S.F.-K.?

Mother's Brief at 6-7.[7]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

_____

[7] L.S.F.-K.'s GAL and legal counsel both joined the Agency's appellee brief advocating for affirming the subject termination decree.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830 (citations omitted); *see* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).

This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). For the following reasons, we conclude that the orphans' court correctly held that the Agency met its burden of proof under 23 Pa.C.S.A. § 2511(a)(8) and (b), which provides as follows:[8]

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

[8] By analyzing only Section 2511(a)(8), we make no conclusions as to the validity of the orphans' court's findings pursuant to Sections 2511(a)(1), (2), and (5). *See B.L.W.*, 843 A.2d at 384. Based on this disposition, we need not review Mother's arguments as to Sections 2511(a)(1), (2), and (5).

- 9 -

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is **imminent** at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009) (citations omitted; emphasis added). Relevant to the third prong of Section 2511(a)(8), this Court has explained that,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §

2511(b); *see also T.S.M.*, 71 A.3d at 267. A Section 2511(b) inquiry must include consideration of the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has reiterated, "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). The *K.T.* Court described the "severance of a necessary and beneficial relationship [as] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-10 (citing *In re E.M.*, 620 A.2d 481, 484 (Pa. 1993)) (subsequent citations omitted).

Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *See id.*

Turning to Mother's argument with respect to Section 2511(a)(8), she contends that the evidence was insufficient to support the orphans' court's findings under the second prong of the subsection. *See* Mother's Brief, at 22. Specifically, Mother argues that the conditions that led to L.S.F.-K.'s removal, i.e., truancy and the mental health issues of L.S.F.-K. and G.F.-K., do not continue to exist or could be remedied promptly. *See id.* Mother contends

that L.S.F.-K.'s mental health treatment and continuing need for placement "were issues outside of her control." *Id.* at 22-23. We disagree.

Mother's fundamental flaw in her argument is her glaring omission of her own unstable mental health and, in turn, her failure to recognize L.S.F.-K.'s mental health condition and seek treatment for her. *See* Mother's Brief, at 22-23; *see also* N.T., 5/14/2024, at 19, 33; Neuropsychological Evaluation of L.S.F.-K. We note that while the truancy concerns were the primary reason that L.S.F.-K. was adjudicated dependent, it was the family's untreated mental health concerns that led L.S.F.-K. to request removal from Mother's home. *See* Order of Adjudication, 5/4/2022, at 1; *see also* Order of Emergency Protective Custody, 6/8/2022; N.T., 5/14/2024, at 18-19, 33, 37.

As to Mother's mental health concerns, it was reported to the Agency that Mother was engaged in mental health counseling at the time of the termination hearing. *See* N.T., 5/14/2024, at 32. However, the Agency was never able to obtain authorization from Mother to confirm any further information regarding her treatment. *See id.* at 33. This was due to Mother's failure to engage with the Agency despite multiple attempts to meet with her to discuss her progress and treatment. *See id.* As best we can discern, Mother only began to engage in her own mental health counseling after January 18, 2024, approximately one month before the Agency filed the underlying termination petition. *See* Factual Findings at 11. Further, while Mother had an array of mental health diagnoses, as described *infra*, the record is silent as to

- 12 -

which of these diagnoses she had begun to receive treatment for after L.S.F.-K. had been removed from her care for almost two years.

Additionally, Mother was ordered to follow all the recommendations from her neuropsychological evaluation, which included a partial hospitalization program. *See* N.T., 5/14/2024, at 19; *see also* Status Review Order, 8/11/2022, at 3; Neuropsychological Evaluation of Mother, at 9. While Mother did enroll in the recommended program, she was unsuccessfully discharged approximately one month later due to attendance issues and negative interactions with other patients, and never re-enrolled. *See* Status Review Order, 8/11/2022, at 2; *see also* Permanency Review Order, 10/12/2022, at 1. Therefore, the conditions related to Mother's mental health still existed at the time of the termination proceeding.

As to L.S.F.-K.'s mental health condition, Mother claims that L.S.F.-K.'s mental health treatment was an "issue outside of her control." *See* Mother's Brief, at 23. This assertion blatantly fails to acknowledge Mother's failure to recognize L.S.F.-K.'s mental health issues and engage her in treatment, which ultimately led L.S.F.-K. to request removal from Mother's home. *See* Order of Emergency Protective Custody, 6/8/2022, at 2; *see also* Status Review Order, 6/8/2022, at 1-2.

Further, Mother failed to actively participate with L.S.F.-K.'s mental health treatment following her removal, which was contrary to the requirements of the permanency plan. *See* N.T., 5/14/2024, at 19, 33. After

L.S.F.-K. was hospitalized due to suicidal ideations that were accompanied by specific planning, which was an escalation from her first visit to Crisis Intervention for suicidal ideations alone, Mother was "not very involved" and was unconcerned that she did not have a working phone, which created difficulties with obtaining consents for L.S.F.-K.'s treatment. *See* Dispositional Order, 12/20/2022, at 2. Mother also claims her lack of engagement with L.S.F.-K.'s mental health treatment was due to L.S.F.-K.'s participation at inpatient mental health programs "for a majority of the time" she has been in the Agency's care. *See* Mother's Brief, at 22-23. Yet the certified record reveals that L.S.F.-K. was only in inpatient treatment for six out of the twenty-three months she had been removed from Mother's care. *See* Dispositional Order, 12/20/2022; Order Regarding Modification of Child's Placement, 5/3/2023. Mother further blames the juvenile court for her lack of engagement with L.S.F.-K.'s mental health treatment, but Ms. Sharp testified that Mother never met with the Agency to discuss L.S.F.-K.'s treatment or progress despite the Agency's multiple attempts to discuss them with Mother. *See* Mother's Brief at 28; *see also* N.T., 5/14/2024, at 33.

Another condition that led to L.S.F.-K.'s removal was Mother's failure to protect her from her brothers due to their untreated mental health concerns. As described above, G.F.-K.'s conduct directly contributed to L.S.F.-K.'s removal from Mother's care. *See* Status Review Order, 6/8/2022, at 1-2; *see also* Order for Protective Custody, 6/8/2022, at 1. Furthermore, Ms. Sharp

testified that M.F. and G.F.-K.'s "inappropriate statements" to L.S.F.-K. led to a "great decline" in her mental health. **See** N.T., 5/14/2024, at 31.

Despite G.F.-K.'s multiple diagnoses, described *infra*, and his own extended stay in a behavioral health hospital after a disconcerting suicide attempt, Mother testified that G.F.-K. was not engaged in any mental health treatment outside of family therapy at the time of the termination hearing.[9] **See** N.T., 5/14/2024, at 52. Further, G.F.-K. still resides with Mother and cannot subsist on his own. **See id.** at 48, 54. Mother relies on G.F.-K.'s Social Security disability income, combined with her own, to afford her household expenses. **See id.** at 55. Therefore, G.F.-K.'s untreated mental health concerns and presence in Mother's home still existed at the time of the termination hearing.

The foregoing evidence demonstrates that the conditions that led to L.S.F.-K.'s requested removal from Mother's care continued to exist at the time of the termination proceeding. The orphans' court acknowledged "that Mother showed some forward progress," i.e., her housing stability and recent enrollment in mental health treatment, yet described it as "no appreciable progress" towards reunification. Orphans' Court Opinion, 7/3/2024, at 20, 24 (emphasis omitted). The record clearly demonstrates that Mother was unable

_____

[9] G.F.-K.'s suicide attempt involved self-harming behaviors, "including cutting his arm with a razor blade and then setting it on fire by spraying hand sanitizer on the wound and setting it on fire with a lighter." Shelter Care Order, G.F.-K., 11/4/2022, at 2.

to imminently reunify with L.S.F.-K. despite being given a reasonable period of time to achieve reunification. **See** N.T., 5/14/2024, at 23; **see also I.J.**, 972 A.2 at 11. Specifically, Mother had not adequately addressed her own mental health concerns; Mother had not engaged or shown interest in L.S.F.-K.'s mental health treatment; and G.F.-K. remained in Mother's home with unresolved mental health issues. Mother testified that she "would do anything at this point" to repair her relationship with L.S.F.-K., but the orphans' court was not required to consider this testimony, particularly considering it had been almost two years since her removal. **See** N.T., 5/14/2024, at 51; **see also M.A.B.**, 166 A.3d at 446 (reiterating that Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child). Therefore, we conclude that ample evidence in the record supports terminating Mother's parental rights under the second prong of Section 2511(a)(8).

With respect to the third prong of Section 2511(a)(8), to the extent that Mother fails to present any argument, it is waived. **See** Mother's Brief at 21-23; **see also Commonwealth v. Noss**, 162 A.3d 503, 509 (Pa. Super. 2017) (finding waiver where appellant failed to develop the issue in his brief) (citing **Lackner v. Glosser**, 892 A.2d 21, 29-30 (Pa. Super. 2006) ("arguments which are not appropriately developed are waived")). Even if not waived, we would conclude the record evidence supports the orphans' court's finding that

termination of Mother's parental rights would best serve L.S.F.-K.'s needs and welfare.

We particularly note that the juvenile court suspended all contact between Mother and L.S.F.-K. in August 2023, finding that "Mother poses a grave threat of emotional, physiological[,] and psychiatric harm to [L.S.F.-K.]" *See* Order, 9/12/2023. Ms. Sharp testified that L.S.F.-K. requested the juvenile court suspend all contact with Mother and L.S.F.-K. was not interested in any contact with Mother. *See* N.T., 5/14/2024, at 23, 31-32. Ms. Sharp further testified that L.S.F.-K. had "made a tremendous amount of progress" in the nine months without contact with Mother. *Id.* at 24.

Despite the juvenile court's order suspending all contact, Ms. Sharp testified that Mother used subsequent court-ordered supervised visitation between G.F.-K. and L.S.F.-K. to attempt to pass unwelcomed gifts and communications to L.S.F.-K. *See id.* at 21, 25-26. Ms. Sharp further testified that these instances of unwanted contact were detrimental to L.S.F.-K.'s mental health. *Id.* at 27-28. The orphans' court found that this evidenced how Mother "placed her own need for connection before L.S.F.-K.'s need for space." Orphans' Court Opinion, 7/3/2024, at 17.

Further, L.S.F.-K.'s performance in school has drastically improved since being removed from Mother's care. L.S.F.-K. was removed at the end of the 2021-2022 school year, in which she was habitually truant and received a D for her final grade in every class. *See* Status Review Order, 6/8/2022, at 2.

However, L.S.F.-K. had perfect attendance as well as A's and B's in all of her classes as of December 2023. **See** Status Review Order, 12/27/2023, at 2. Therefore, the foregoing record evidence supports that termination of Mother's parental rights would best serve the needs and welfare of L.S.F.-K. Accordingly, we discern no abuse of discretion or error of law in the orphans' court's finding that termination of Mother's parental rights was warranted pursuant to Section 2511(a)(8).

With respect to Mother's challenge to Section 2511(b), she contests the sufficiency of the evidence. **See** Mother's Brief at 25-26. Mother argues she has a bond with L.S.F.-K. that was "denigrated" as a result of the juvenile court requiring their contact to be supervised and further reducing and ultimately precluding any contact between them. **Id.** We disagree.

The orphans' court found that there is no bond between L.S.F.-K. and Mother, which is supported by the record evidence, as follows. **See** N.T., 5/14/2024, at 63-64; **see also** Orphans' Court Opinion, 7/3/2024, at 27. As repeatedly mentioned, but worth reiterating here, L.S.F.-K. requested to be removed from Mother's home in June 2022. In August 2023, L.S.F.-K. requested to cease all contact with Mother and continued to request no contact through the time of the termination hearing. **See** N.T., 5/14/2024, at 23, 32; **see also** N.T., 10/25/2023, at 13. When questioned about her preference on the outcome of the termination proceeding, she replied "I want to be an orphan." N.T., 5/14/2024, at 41-42. Ms. Sharp testified that L.S.F.-K. has

remained steadfast in wanting Mother's parental rights terminated. ***See id.*** at 38. Further, L.S.F.-K. discontinued any contact with G.F.-K. because of his connection to Mother. ***See*** N.T., 12/27/2023, at 5; ***see also*** N.T., 10/25/2023, at 7. This evidence belies Mother's assertions that she has a bond with L.S.F.-K. Ms. Sharp testified that it would be detrimental to L.S.F.-K.'s mental health to keep Mother's parental rights intact. ***See*** N.T., 5/14/2024, at 24.

The orphans' court also considered L.S.F.-K.'s need for permanency. ***See*** Orphans' Court Opinion, 7/3/2024, at 20, 28. L.S.F.-K. had been adjudicated dependent for twenty-seven months and removed from Mother's care for twenty-three months at the time of the termination hearing. L.S.F.-K. had resided in three foster homes, a behavioral health hospital, and a group home in Philadelphia before her placement in her current group home. ***See*** Status Review Order, 6/8/2024, at 2; Order Regarding Modification of Child's Placement, 11/9/2022; Order Regarding Modification of Child's Placement, 12/7/2022; Dispositional Order, 12/20/2022; Order Regarding Modification of Child's Placement, 5/3/2023; Order Regarding Modification of Child's Placement—Amended, 8/21/2023. As to L.S.F.-K.'s permanency, Ms. Sharp testified as follows:

> Permanency looks different for every minor that we deal with. I think for L.S.F.-K. specifically, I think she has a lot of struggles with coming to court and having to constantly have Mother and her family kind of as this cloud over her. I think for L.S.F.-K. permanency looks like being able to remove that piece and focus on the goals she has made mentally and establish the

independence she is looking for that she thinks would be helpful for her to move on in her life when she becomes an adult.

N.T., 5/14/2024, at 29 (cleaned up).[10] Based upon the foregoing testimonial evidence, we discern no abuse of discretion or error of law in the orphans' court's conclusion that CYF met its evidentiary burden pursuant to Section 2511(b).

In her third and final issue, Mother essentially argues that her parental rights should not have been terminated with respect to L.S.F.-K. because she was reunified with G.F.-K. *See* Mother's Brief, at 27-28. Regarding reunification with G.F.-K., she acknowledges that "each child must be treated as unique and that the circumstances as to each child may be different and potentially support different results." *Id.* at 27. However, she questions how G.F.-K. could be returned to her care when her parental rights to L.S.F.-K. were terminated. *See id.* at 27-28. As G.F.-K. is not subject to the instant appeal, we will not address the legality of his return to Mother's care. In any event, we are unpersuaded by Mother's argument for many reasons.

Our Supreme Court has established that:

[T]rial courts in termination cases should utilize the established relevancy test on a case-by-case basis when asked to assess the admissibility of evidence related to a parent's ability to care for a child other than the child who is subject to the termination

---

[10] Further, the Agency had vetted two of L.S.F.-K.'s paternal uncles who had been appropriately communicating with L.S.F.-K. through text messages. *See* N.T., 5/14/2024, at 42-44. Moreover, the uncles had offered to pay for plane tickets for L.S.F.-K. to visit with them in Colorado and the Agency was working on the logistics for a visit to occur potentially over the summer. *Id.*

proceeding. If the trial court deems the evidence to be relevant, then the evidence should be admitted into the record and the court, as fact-finder, should assign that evidence the appropriate weight to which it is entitled in reaching its factual and legal conclusions.

***In re Interest of S.K.L.R.***, 256 A.3d 1108, 1124 (Pa. 2021).

In the case *sub judice*, the orphans' court incorporated G.F.-K.'s entire dependency record into L.S.F.-K.'s termination proceeding without objection. **See** N.T., 5/14/2024, at 35. G.F.-K.'s dependency record supports the orphans' court's declaration that his reunification with Mother was not a result of her full compliance and progress with her permanency goals, which was described *supra*. **See** N.T., 5/14/2024, at 34; **see also** Orphans' Court Opinion, 7/3/2024, at 30. The orphans' court was within its discretion to consider the evidence as to G.F.-K.'s dependency record and his return to Mother's care, assign it appropriate weight, and ultimately reach its factual and legal conclusions that termination of Mother's parental rights was warranted as to L.S.F.-K. Therefore, we discern no abuse of discretion or error of law.

Thus, we affirm the decree pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

- 21 -

Decree affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: 11/14/2024